# EXHIBIT A

**IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT**
**DUPAGE COUNTY, ILLINOIS**

Candice Adams
e-filed in the 18th Judicial Circuit Court
DuPage County
ENVELOPE: 40009318
2026LA001328
FILEDATE: 9/15/2026 5:46 PM
Date Submitted: 9/15/2026 5:46 PM
Date Accepted: 9/16/2026 8:38 AM
CK

| | |
|---|---|
| MICHAEL JAFFE, on behalf of himself and all others similarly situated, | |
| Plaintiff, | Case No. |
| vs. | 2026LA001328 |
| TOYOTA MOTOR SALES, U.S.A., INC., TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., and DOES 1-20, | **JURY TRIAL DEMANDED** |
| Defendants. | |

**<u>CLASS ACTION COMPLAINT</u>**

Plaintiff Michael Jaffe, individually and on behalf of others similarly situated, by and through his counsel, and, based on personal knowledge as to matters pertaining to Plaintiff, and upon information and belief following investigation of counsel, alleges as follows against Toyota Motor Sales, U.S.A., Inc., Toyota Motor Engineering & Manufacturing North America, Inc., Toyota Motor North America, Inc. and Does 1-20 (collectively, “Defendants” or “Toyota”).

## INTRODUCTION

1. This action seeks relief for Plaintiff and other purchasers of Defendants’ Toyota Camry Hybrid and Toyota Corolla Cross Hybrid cars made and sold with a dangerous “inverter assembly” product defect that exposes drivers and occupants, and passengers in other cars, to bodily harm, death, crash, and auto damage (the “Cars”).

2. Within six days after Plaintiff's new 2026 Toyota Camry purchase in December 2025, Plaintiff's new Car would be subject to a recall that resulted in loss of use of his car until August 2026.

3. Defendants knew of the defect before Plaintiff purchased his car, but kept quiet about it, and did not stop its Toyota dealers from selling the soon to-be-recalled vehicles.

4. Plaintiff's car languished on a Toyota deal parking lot for close to six months before Toyota purported to repair it, and he was deprived of the enjoyment of his new Car as a result.

5. Due to the defect, the new Cars were worth less than the price paid for them at retail, were diminished in value, and were not fit for use.

**PARTIES, JURISDICTION AND VENUE**

6. Plaintiff Michael Jaffe is a citizen of the State of Illinois.

7. Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is a corporation organized and existing under the laws of California, with its principal place of business in Plano, Texas.

8. TMS sells and markets Toyota cars in the United States for Toyota Motor Corporation. TMS distributed the Cars from Toyota's plants to its dealers that sold the Cars, and for the purpose of selling the Cars at retail, to Plaintiff and other Car buyers; TMS makes express warranty representations about the Cars; TMS receives technical field reports and warranty claims, which would include reports and claims relating to the Cars' inverter bolt defect as set forth below; TMS published an FAQ and Remedy Notice about the Car recall at issue; and TMS published the technical instructions for its Toyota dealers to repair or replace parts to remedy the Car defect at issue. According to TMS, "Every [Toyota] vehicle sold in the U.S. depends upon [TMS's] extensive network of dedicated professionals who align business strategy, IT, data analytics, sales and marketing resources nationwide." See https://www.toyota.com/usa/operations#!/Sales-

Marketing. A 2026 Camry Hybrid Owner's Manual for the Cars states that notices regarding safety defects should be given to TMS.

9. Defendant Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is headquartered in Plano, Texas. TEMA is responsible for Toyota's engineering design, development, and manufacturing activities in the United States. TEMA caused the Cars to be made for the purpose of sale at retail at Toyota dealerships, like Plaintiff's Car. TEMA also made the determination to recall the Cars; it provided the notice of the Car recall to the NHTSA; and it is listed as the maker of the Cars on the recall notice.

10. Toyota Motor North America, Inc. ("TMNA") is headquartered in Plano, Texas. TMNA overseas sales, marketing, manufacturing and customer service for Toyota vehicles across the United States, including the Cars. TMNA's Defect Information Report for the defect and Cars at issue dated December 15, 2025, names TMNA as the "U.S. Sales Company." TMNA also published a report dated February 10, 2026, amending the original recall notice for the Cars.

11. Doe Defendants 1-20 are officers, employees, and agents of Toyota, and other entities, who are or may be liable for the wrongful conduct alleged herein, who may have participated as co-conspirators with Defendants, and/or who acted together to make, market, distribute, or sell the Cars or components thereof, or to address the defect at issue, whom Plaintiff may name as additional Defendants upon learning their true identities following discovery.

12. By design, the named Defendants operate as part of one company doing business as Toyota. Defendants collaborate to provide Toyota operations in the U.S.A. Each played a role in the recall at issue. Each Defendant acted as an aider, abettor and co-conspirator of each and every other Defendant, or is obligated by law to be financially responsible for such conduct. In engaging in the conduct alleged herein, each Defendant acted as the agent, employee,

representative, partner or joint venturer of the other Defendants in the commission of the acts alleged herein and acted within the course and scope of its duty as such agent, employee, representative, partner or joint venturer. The acts of each Defendant were authorized or ratified by each other Defendant and together constitute a single and continuing course of conduct.

13. Venue and jurisdiction before this Court are proper.

14. Defendants regularly conduct business in the state of Illinois, including DuPage County; and acts and omissions giving rise to Plaintiff's claims occurred in DuPage County, Illinois.

**SUBSTANTIVE ALLEGATIONS**

15. Defendants caused the Cars -- the Camry Hybrid, and the Toyota Corolla Cross Hybrid ("Corolla Hybrid"), years 2025-2026, produced during a certain time period in 2025 -- to be designed, made, and sold to at retail to consumers in Illinois and nationwide.

16. Defendants admit that the Cars are dangerously defective.

17. These Cars, known as "hybrids," can be alternatively powered by traditional gasoline or a battery.

18. The Cars come equipped with hybrid engines, which contain a hybrid inverter that enables electric power.

19. The "inverter" is a key component of the inside build of the Cars: it converts power from the battery to the electric motor.

20. Also called a power control unit or PCU, the inverter is the electrical component that converts direct current (DC) power stored in the vehicle's battery into alternating current (AC) power that the electric motor uses to drive the wheels. During deceleration and braking, it performs the reverse function—converting the motor's AC output back to DC to recharge the battery through

regenerative braking. The inverter contains high-powered transistors controlled by a processor that receives real-time sensor feedback to switch power on and off as needed. *See generally* https://nx-tech.com/insight-hub/what-is-an-inverter/.

21. At relevant times, Defendants promise that the inverter components in the Cars are in good working order, because the Cars come with a Toyota warranty coverage for these very same components.

22. Before Plaintiff purchased his new Camry Hybrid and unbeknownst to him, Defendants had a long history of distributing hybrid vehicles that became subject to recalls. These recalls include:

a. recall (11V-342) of 45,528 Toyota Highlander HV and Lexus RX400h vehicles;

b. recall (13V-396) of 133,081 Toyota Highlander HV and Lexus RX400h vehicles;

c. recall (14V-053) of 698,457 Toyota Prius vehicles;

d. recall (15V-449) of 108,624 Toyota Prius vehicles;

e. recall (18V-684) of 807,329 Toyota Prius vehicles;

f. recall (20V-369) of 266,638 Toyota Prius vehicles;

g. recall (17V-658) of 6 Toyota Prius vehicles; and

h. recall (18V-579) of 192,347 Toyota Prius vehicles.

23. On December 16, 2025, the National Highway Traffic Safety Administration issued recall notice 25V-869 (the "Recall"), for a defective hybrid inverter, impacting up to 51,644 Toyota model 2025-2026 Camry Hybrid cars and 3,761 model 2026 Toyota Corolla Cross Hybrid cars made, including Plaintiff's model year 2026 Toyota Camry Hybrid (that is, collectively herein, the "Cars").

24. Plaintiff's new Camry Hybrid was the subject of the Recall.

25. The NHTSA Recall notice names Denso Manufacturing Tennessee, Inc. ("Denso") as the manufacturer of the defective inverter assembly in Plaintiff's and other consumers' Cars.

26. Denso had been the manufacturer of the parts or systems in a number of the recalls set forth above; yet Toyota has elected to continue to partner with Denso; and Denso made and supplied the inverter assemblies for the cars effected by the recall. A Toyota company is Denso's largest shareholder.

27. According to the NHTSA Recall notice, the bolt inverter defect was far more than nuisance value: it may cause the car to lose motive power, crash, short circuit, or set on fire, and may damage of the components not just within the inverter assembly, but also, those around it.

28. At least as early as November 2025, Defendants knew there was a catastrophic defect in the inverter in the Camry Hybrid and Corolla Hybrid. Nevertheless, Defendants continued to cause the Cars to be sold at relevant times.

29. All of the Cars were sold equipped with said defect.

**Important Car Defect and Recall Details**

30. At the heart of the inverter defect lies a key bolt that secures internal components of the power control unit or inverter assembly for the affected Cars.

31. Denso made and supplied the inverter assembly for Toyota's affected Cars.

32. The machine setting used to manufacture the inverter assembly for the Cars was *wrong*; this prevented proper installation of a specific bolt needed for the inverter. Due to the improper setting, the bolt, used to connect inverter assembly components, was insufficiently or improperly torqued. Indeed, the bolt may completely detach from its matching hole and drop into the inverter assembly.

33. The low-torque condition of cars produced persisted for close to three months. The time periods when the wrong machine setting prohibited proper bolt installation for the inverter assembly component were pinpointed to be August 26 to November 18, 2025 for Camry Hybrid Cars, and August 27 to November 25, 2025 for the Corolla Hybrid Cars.

34. Thus, by November 18 or November 25, the inverter production method that led to the dangerous defect had been stopped or corrected. Yet, after this time, and until the December 16 recall notice, Toyota kept permitting its cars to be sold – without disclosure of the defect -- to Plaintiff and other purchasers.

35. Well before December 10, 2025, Denso had inspected its equipment, found additional assemblies that had the low-torqued bolt, reviewed its production history, discovered the problem, and, together with Toyota, confirmed that the bolt could completely detach based on the machine settings that caused the improperly torqued-bolts.

36. The nature of the defective and unsafe inverter came to Defendants' attention at least as early as the beginning of November 2025:

> In early November, Toyota received a field report alleging that a vehicle could not turn on. Based on an inspection by the dealer and subsequently at the supplier, it was found that a bolt within the inverter assembly had come loose and was lying on the circuit board. The supplier used this information to review the assemblies that were currently in its facility and found additional assemblies had a specific bolt with low torque. The supplier then reviewed its production history for any changes to torque or machine settings. It found that the settings of a machine had changed that could lead to a potential low torque condition of a specific bolt within the inverter assembly.

25V869, Part 573 Safety Recall Report.

37. Defendants require Toyota dealers to submit field technical reports (which would include such defects) through internal systems.

38. Defendants also admitted that, by December 10, 2025 -- within the very short time period after their brand new Cars had rolled off the production lines and been sold -- they had already received 34 Field Technical Reports and 15 warranty claims that relating to this condition. *Id.*

39. Defendants waited until December 16, 2025 to cause the recall to be issued. Until that time, Toyota dealers continued to sell the affected vehicles to consumers including Plaintiff.

40. Toyota submitted the recall for these vehicles as their manufacturer and sold them under its own brand (Part 573 Safety Recall Report 25V869, https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V869-6476.pdf).

41. Toyota is responsible for the defective inverter assemblies installed in the Cars, notwithstanding that Denso assembled them. Toyota sold the Class Vehicles under its own brand and submitted the recall report for them as their manufacturer (Part 573 Safety Recall Report 25V869, https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V869-6476.pdf). Denso Manufacturing Tennessee, Inc. is identified in that report as the component manufacturer of the inverter assemblies (*id.*).

42. The automotive industry publishes a standard for analyzing manufacturing risk that reflects the practices of vehicle manufacturers, suppliers, and consultants (SAE J1739-202101, Foreword, p. 1). The standard requires each company to establish ownership of its risk-analysis procedures (§ 4.2, p. 10); requires those procedures to account for external standards, including SAE's (§ 4.2, p. 10). See SAE International, *Surface Vehicle Standard J1739* (issued July 1994, rev. Jan. 2021), https://www.sae.org/standards/content/J1739_202101.

43. Remarkably, whatever process controls Toyota and Denso employed did not detect the defective low-torque condition at any point during three-month production period from August

26, 2025 through November 25, 2025 and encompassed approximately 55,405 vehicles (Part 573 Safety Recall Report 25V869, https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V869-6476.pdf). The condition was identified only after a customer's vehicle failed in the field and was inspected by a dealer and then by the supplier (*id.*); only then did the supplier examine the assemblies in its own facility and find additional units with the bolt at low torque (*id.*); and only then did it review its production history and identify the machine settings change (*id.*). On information and belief, Toyota failed to implement, and failed to ensure that Denso implemented, automotive industry standard controls of the kind described below — designed to prevent the low-torque condition, or to detect it before the affected assemblies shipped.

44. The industry standard provides:

(a) that a machine's settings are a parameter requiring special care, to be monitored so that verified settings are maintained and unexpected variation is identified (§ 6.4.5, p. 77), and that every such parameter must appear in the written plan governing how the process is controlled (§ 6.4.5, p. 77);

(b) that this written control plan should emphasize controls applied at the point of manufacture, should prevent problems rather than merely detect them afterward, and should verify the work at the earliest possible step in the process (§ 6.6.4, p. 83);

(c) that checking a fastener's tightness by machine is a recognized automatic method of confirming that a product conforms to specification (§ 6.2.2.10.5, p. 63);

(d) that a fastener tightened below specification is a foreseeable way for an assembly operation to fail, with an out-of-calibration tool among its identified causes (Figs. 39–41, pp. 69–70), and that a machine's capability and its initial setup adjustment are identified causes of manufacturing failure (§ 6.3.4, p. 69);

(e) that when an already-approved production process is changed, the process documentation and the written control plan are to be reviewed and updated to account for the change (§ 6.6.5.1, p. 86); and

(f) that a failure capable of affecting safe vehicle operation, or the health of drivers, passengers, other motorists, or pedestrians, receives the highest severity rating on the standard's scale (App. F, p. 93).

See SAE International, *Surface Vehicle Standard J1739* (issued July 1994, rev. Jan. 2021), https://www.sae.org/standards/content/J1739_202101 (§ 6.2.2.10.5, p. 63; § 6.3.4, p. 69; Figs. 39–41, pgs. 69–70; § 6.4.5, p. 77; § 6.6.4, p. 83; § 6.6.5.1, p. 86; App. F, p. 93).

45. Here, at the facility where the inverter assemblies were assembled (Part 573 Safety Recall Report 25V869, https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V869-6476.pdf), the settings of a machine used to tighten a bolt inside the assembly were changed in a way that could produce a low-torque condition (*id.*), and the resulting condition went undetected across approximately three months of production (*id.*).

**Toyota's Purported Remedy**

46. Defendants' recall notice of December 16, 2025 provided no remedy to the dangerous defect.

47. A subsequent Interim Notice of the Recall, published by TMS, estimated a repair remedy to be available in the first quarter of 2026.

48. An NHSTSA letter to TEMA dated December 22, 2025, states that "Interim owner notification letters explaining the safety risk are expected to be mailed January 30, 2026."

49. On February 10, 2026, TMNA published Toyota's Amended Defect Information Report, which amended the original Recall report of December 12, 2025, and announced a remedy

of repair, or replacement of the hybrid inverter assembly. Still, Toyota provided no timeline or clue about when.

50. On February 13, 2026, Toyota published an interim safety warning letter about the defect.

51. Not until June 18, 2026, more than six months after the December 2025 recall, while Car owners had sat in limbo, did Defendant TMS publish Toyota's Remedy Notice ordering Toyota dealers: "STOP! DO NOT SELL NEW VEHICLES IN DEALER INVENTORY."

52. The Remedy Notice, at last, detailed how repairs would proceed, and told customers to contact the dealership about the Safety Recall.

53. The Remedy Notice provides for repairs to be initiated in stages beginning as early as June 18, 2026 and continuing through October 15, 2026.

54. Thus, while Cars were unsafe to drive as set forth above, it nonetheless took more than four months from the publication of the remedy to begin the implement it.

55. Toyota's Technical Instructions for the Safety Recall provide for an elaborate attempt, requiring up to more than one hundred complicated steps (leaving room for error), to repair the inverter 'bus bar bolt" defect, and reference concern about multiple bolts (rather than just one).[1]

56. The instructions secondarily contemplate replacing the inverter assembly, including if the repair attempt fails.

**Regulatory Scheme Governing Recalls**

57. The National Highway Safety Administration regulates auto recalls in the United States. Its authority is codified under the National Traffic and Motor Vehicles Safet Act (49 U.S.C.

[1] https://www.youtube.com/watch?v=OS-8vf7C84U

§ 30101 *et seq.*). Manufacturing defects must be reported. Federal regulation provides that "[e]ach manufacturer shall furnish a report to the NHTSA for each defect in [its] vehicles or in [its] items of original or replacement equipment that [it] or the Administrator determines to be safety related." 49 CFR § 573.6(a). The reports must include "a summary of all warranty claims, field or service reports, and other information, with their dates of receipt." 49 CFR § 573.6(c).

58. NHTSA and manufacturers each have authority to conduct safety recalls. 49 U.S.C. § 30118. The Secretary of Transportation may order a manufacturer to notify owners and remedy a defect, or the manufacturer may conduct a voluntary recall.

59. Dealers are not allowed to sell or deliver new cars subject to an open safety recall, 49 U.S.C. § 30112. Thus, the longer it took for Toyota to report to the NHTSA, the longer the Cars could be sold.

60. NHTSA requires a safety related defect to be reported within five (5) working days after it is determined. 49 CFR 573.6(b). Toyota admits it received notice of reports of the defect as early as early November 2025, but the Car safety recall was not issued until December 16, 2025.

**<u>Plaintiff's Experience</u>**

61. Plaintiff has purchased several Toyota vehicles and previously considered himself to be a loyal Toyota customer.

62. On December 10, 2025, Plaintiff purchased a new 2026 Camry Hybrid Car from McGrath Elmhurst Toyota located in Elmhurst, Illinois, which came equipped with the above-described safety defect.

63. After Plaintiff learned of this grave Car safety defect, on or about February 25, 2026, Plaintiff brought the vehicle to the Toyota dealer, McGrath Toyota Elmhurst, given the danger posed by the defect.

64. But, Defendants had no fix for Plaintiff's Car; so the Toyota dealer gave Plaintiff a vehicle to use – instead of the Car that Plaintiff bought, which is the Car that he wanted to drive – until a fix could be implemented. Plaintiff was required to bring in and exchange the "loaner" car for a new "loaner" agreement and car on several occasions, because, upon each time such agreement expired, Toyota still had no "fix" for the dangerous defect.

65. Defendants finally implemented a purported repair, purportedly repaired the vehicle, and caused it to be returned to Plaintiff months later, on August 18, 2026.

66. From the date of his Car purchase until Toyota purportedly repaired his vehicle, communication from Toyota about the defect was scant: apart from receiving a recall notice, Defendants failed to communicate with Plaintiff about the recall, failed to update Plaintiff about the status of the recall or any remedy, including timing thereof, and failed to respond to Plaintiff's written communications and demands to Toyota on the topic.

67. During this expansive period of time, only shortly after purchase, Plaintiff was deprived of the enjoyment and use of his new Car.

68. Plaintiff was damaged due to his Toyota Car being sold with a defect, and by virtue of sitting idle on the Toyota dealer's lot for a lengthy period of time.

69. For example, Plaintiff paid more for his new Car that he would have paid, had he known of the defect, and the market value of the Car sold new at retail was worth less due to the defect.

70. The value of Plaintiff's Car was diminished including, without limitation, due to it sitting idly on a Toyota dealer lot, for an expansive period of time, awaiting a repair, whereby the Car battery degrades**;** Car brakes may develop rust, "pitting" and corrosion; Car rubber components and engine oil may degrade; the Car exterior may (and is suspected to) incur ultra-

violet light, weather damage, or damage from the outdoor elements, including paint wear; and the Car body and undercarriage may develop rust.

71. Plaintiff's warranty and service agreement also was diminished in value due to the expansive idle period in which his Car was idle waiting for repair.

72. Had Plaintiff known of the defect at the time of sale, he would never have purchased his Camry Hybrid or would have paid less for it.

73. Defendants knew, at relevant times and prior to Plaintiff's Car purchase, that the improperly torqued bolt defect created risk of short circuit, crash, fire, or worse.

## CLASS ACTION ALLEGATIONS

74. Plaintiff brings his claims on behalf of himself, and pursuant to 735 ILCS 5/2-801 on behalf of the following Class:

> All purchasers of the Cars, sold as new at a Toyota dealer in Illinois, at any time in the year 2025.[2]

Excluded from the Class are the Defendants' officers, directors, and employees; Plaintiff's counsel; and any member of the judiciary presiding over this action.

75. The class is so numerous that joinder of all the members of the Class is impracticable.

76. Questions of fact or law are common to the Class, predominate over any questions affecting only individual members, and frame issues for class-wide adjudication, including, by way of example, as follows:

a. Were the affected vehicles sold with the inverter bolt defect?

---

[2] Plaintiff intends to amend the Class definition, or add classes or subclasses, as appropriate and pursuant to discovery.

b. Did Defendant's conduct violate the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA")?

c. Are Plaintiff and other affected vehicle owners entitled to damages?

d. Are Plaintiff and the Class entitled to punitive damages?

77. Plaintiff's claims are typical of the Class. As with the other Class members, Plaintiff purchased a new vehicle that is the subject of the Recall.

78. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to the Class members, and Plaintiff has retained counsel competent and experienced in class action litigation.

79. A class action provides a superior and manageable method for fairly and efficiently adjudicating this controversy because, among other things, joinder of all members of the Class is impracticable, prosecution of individual actions risks inconsistent adjudications of the same matter, and many members of the Class cannot feasibly vindicate their rights by individual suits because the monetary value of their recoveries are outweighed by the burden and expense of litigating individual actions against the giant corporate defendants.

**CAUSES OF ACTION**

80. Plaintiff brings the following causes of action against Defendants individually and on behalf of all similarly situated individuals, and in the alternative as warranted by facts or law.

**COUNT I**

**VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (ICFA), 815 ILCS 505/1 *ET SEQ.***
**(DECEPTIVE CONDUCT)**

81. Plaintiff repeats and re-alleges the preceding allegations as though fully set forth herein.

82. Defendants are and were, at relevant times as set forth herein, engaged in "trade" and/or "commerce" regarding "merchandise" as those terms are defined under the ICFA, 815 ILCS 505/1(b), (f).

83. Plaintiff is a "consumer" within the meaning of the ICFA, 815 ILCS 505/1(e).

84. Defendants made, marketed, and distributed the Cars that Plaintiff and the Class purchased new, at retail, at authorized Toyota dealers.

85. Defendants give instructions and prohibitions to the Toyota dealers about what they must do, should do, or cannot do. For example, as set forth above, TMS's Remedy Notice told dealers to stop selling the Cars, after the NHTSA recall notice was published; TMS gives dealers correspondence templates to provide to customers about the Cars; and Defendants publish, distribute, or furnish written materials, about the Cars, for Car buyers (and prospective buyers), including, without limitation, Toyota website representations about the Cars on Toyota's website; written materials that come with Car purchase; or other materials.

86. Defendants failed to disclose to Plaintiff and other Car purchasers, at the time of vehicle sale (or prior thereto), via any of these means, or in any other way, that the Cars were made with the catastrophic defect and would be unsafe to drive as set forth above.

87. Defendants also concealed and knowingly failed to disclose, at the time Plaintiff purchased his Car, that the Cars were made with the catastrophic defect and would be unsafe to drive as set forth above. At that time, Defendants knew of the defect and could have issued a stop sell instruction to its Toyota dealer where Plaintiff purchased his Car, but, on information and belief, it didn't.

88. Defendants intended that Plaintiff and the Class rely on the aforesaid omissions when purchasing the Cars and at relevant times.

89. Plaintiff and the Class overpaid for their defective Cars. Had Plaintiff and other Class members known the truth, and known of the defect, they would not have purchased their Cars or would have paid less for them.

90. Plaintiff and other Class members' Cars and associated warranties and service agreements are worth less, and/or were worth less at the time of sale, due to the above-described defect and Toyota's response thereto.

91. Plaintiff and other Class members' Cars incurred and are subject to consequential Car damage caused by Cars sitting idly for a substantial period of time, while the Cars were unsafe to drive and before they were repaired.

92. Plaintiff and other Class members were deprived of use and enjoyment of their vehicles, as set forth above.

93. As a result of Defendants' conduct in violation of the ICFA, Defendants caused actual damage to Plaintiff and other Class members, who are also entitled to any available actual, consequential and punitive damages, and attorneys' fees and costs.

94. As a result of said conduct, Defendants should be enjoined from perpetrating future like misconduct; the Court should issue any appropriate injunctive relief; and Defendants should be required to implement an inspection and repair program to assess and address consequential damage to affected Cars as set forth above.

## COUNT II

### VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (ICFA), 815 ILCS 505/1 *ET SEQ.* (UNFAIR CONDUCT)

95. Plaintiff repeats and re-alleges the preceding allegations as though fully set forth herein.

96. The ICFA is a remedial statute designed to prohibit unfair conduct in sales transactions. 815 ILCS 505/2 *et seq*.

97. As set forth above, Defendants made, marketed and distributed, for purposes of sale to Plaintiff and the Class, Cars which contained the catastrophic defect, which was fundamentally unsafe and could lead to bodily injury or death, loss of motive power, crash, fire, short circuit, and vehicle damage, as more fully set forth above.

98. Plaintiff and other Car purchasers had no choice but to patiently wait for long-awaited repairs for their new Cars while they were defective and dangerous to drive.

99. Defendants caused the cars marketed and sold to Plaintiff and the Class to be made without regard to automotive industry manufacturing standards, as set forth above.

100. By waiting until December 16 to cause the Car recall to be issued, Defendants and its authorized dealers were able to garner benefits or profits at the expense of Plaintiff and other Car buyers.

101. Such conduct by Defendants caused substantial injury to Plaintiff and other Class members, with no countervailing benefit; offends public policy; and is oppressive, unethical, immoral, and unscrupulous.

102. At relevant times, Defendants intended that Plaintiff and other Class members would rely on their above-described conduct; and Defendants failed to cause the defect to be disclosed to Plaintiff and the Class at the time of sale.

103. Due to Defendants' conduct, Plaintiff and other Toyota purchasers overpaid for their affected vehicles, which were worth less than the purchase price at the time of sale; Plaintiff and other Car purchasers were deprived of use and enjoyment of their Cars; and the value of the Cars and associated warranties and purchase plans are worth less. Further, Defendants should be

required to address the risk of Plaintiff's and other Class members' Cars incurring consequential damages due to idling while waiting for repairs.

104. As a result of Defendants' conduct in violation of the ICFA's prohibition of unfair conduct, Defendants caused actual damage to Plaintiff and other Class members, who are also entitled to attorneys' fees and costs under the ICFA.As a result of said conduct, Defendants should be enjoined from perpetrating future like misconduct and the Court should issue appropriate injunctive relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully prays that the Court issue judgment against Defendants and order as follows:

a. Certify the Class, and designate Plaintiff as a class representative and his counsel as class counsel;

b. Find that Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act as set forth above;

c. Award damages to Plaintiff and the Class permitted by applicable law, including any actual, economic, compensatory, exemplary and punitive damages;

d. Provide commensurate injunctive relief for Plaintiff and the Class;

e. Award reasonable attorneys' fees and costs; and

f. Provide such other and further relief that the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all matters so triable.

MICHAEL JAFFE, on behalf of
himself and all others similarly situated,

By: ______________________
One of Plaintiff's Counsel

Ilan Chorowsky
ilan@fairbridgelaw.com
Mark Bulgarelli
mark@fairbridgelaw.com
FAIRBRIDGE LAW LLC
1570 Oak Avenue, Suite 103
Evanston, Illinois 60201
773-915-1000
Attorney #: 410214

*Attorneys for Plaintiff and the Proposed Class*